FOLKS *v.* BURLETSON.

1. PARTNERSHIP — EVIDENCE OF EXISTENCE — HOLDING OUT — ESTOPPEL.

Testimony tending to show the establishment of a private bank by several defendants, who were held out in advertisements and statements made as partners in the concern, and testimony tending to show that they were engaged in the attempt to organize several private banks with another incorporated bank in which they were interested as a center, *held*, to sustain a verdict for plaintiff against the members of the alleged partnership, on the theory that defendants permitted themselves to be held out to the public as partners in the private banking firm.

2. SAME—MISREPRESENTATION.

As applied to partners, such holding out is fundamentally predicated on the general principle of estoppel by conduct, but comprehends, also, indirect misrepresentation and signifies that the purported partners have, by language and conduct, represented themselves, or knowingly have suffered others to represent them at large, as partners in such manner and to such an extent as to lead the public to believe that they are partners in fact.

3. SAME—AUTHORITY TO REPRESENT—FRAUD.

It is not necessary to show express authority to hold out a person as member of the firm; authority may be inferred from defendant's conduct. If he has, by signing prospectuses, or by being party to resolutions, or by statements made, or has in any other way so conducted himself as, in fact, to have authorized the holding out, he is liable.

4. SAME—EVIDENCE—MEMBERS OF FIRM.

It was not error to admit in evidence an advertisement relating to a State bank in a neighboring town, wherein the defendants were mentioned by name as officers, directors and stockholders, followed by a statement that they were back of the private bank in question, representing a responsibility of about $300,000.

**5. SAME—HEARSAY.**

Nor was it error to admit statements made by persons employed and placed in charge of the bank that defendants or some of them were running the private bank; the rule that an agent's authority cannot be proved by his own declaration was not violated thereby.

**6. SAME—EVIDENCE—TESTIMONY OF PARTNER'S ADMISSIONS.**

Where one of the defendants admitted his liability, after he had pleaded the general issue and did not suffer default to be entered against him, his representations, not made in the presence of the remaining defendants, and supported by his testimony showing copartnership relations, were properly received in evidence to establish the connection of defendants with the bank: and any possible error was cured by the action of the court in charging the jury that this evidence should not be considered.

**7. SAME—TRIAL—CHARGE—ESTOPPEL.**

The court did not in anywise prejudice defendants by instructing the jury that a person who holds himself out as a partner of a firm is estopped to deny the representations as to the persons to whom the statements were made and as to others who acted in reliance on them, that reliance on mere rumor or hearsay would not be reasonable diligence, unless there was actual holding out to the public, that defendants' denial of any knowledge of such representations or statements should be a defense, unless the greater weight of the evidence established the contrary, that if there was a general holding out to the public by one or more of the defendants as members of a partnership or joint venture, depositors of the bank who relied thereon could recover: any possible error in such charge was in favor of the defendants as to the distinction between liability by holding out and liability by estoppel.

**8. SAME.**

The fact that a creditor relied on mere hearsay or rumor would not preclude him from recovering if he could establish by proof of facts and circumstances a holding out of defendants as members of the firm.

**9. SAME.**

Evidence that defendants suffered themselves to be held out as partners in the bank, and in fact associated together under an agreement to share the profits, al-

though defendants denied the claim, warranted the trial court in finding that the verdict was not contrary to the weight of the evidence.

10. SAME.

All that is generally required to constitute a partnership as between the parties is that there should be an agreement to share in the profits and losses; and even less than this may make them responsible as between themselves and third parties.

Error to Jackson; Parkinson, J. Submitted November 11, 1912. (Docket No. 143.) Decided September 30, 1913. Rehearing denied November 3, 1913.

Assumpsit by Alfred Folks against William H. Burletson, Gardner L. Hunn, Albert M. Helmer, Charles W. Bullen, and Fennor K. Corwin for certain debts or claims owing by the Farmers' & Merchants' Bank of Hanover, Michigan, a copartnership. Judgment for plaintiff. Defendants except said Burletson bring error. Affirmed.

*Thomas E. Barkworth* and *George E. Nichols,* for appellants.

*Price & Whiting* and *Benjamin Williams,* for appellee.

STEERE, C. J. This was an action in assumpsit brought in the circuit court of Jackson county, by plaintiff in his own behalf and as assignee, for the purposes of this case, of over 100 codepositors and creditors of the Hanover Bank of Hanover, Mich., a financial institution which had previously closed its doors and its brief but checkered career, with the help of a receiver appointed by the court. Plaintiff recovered from defendants a judgment, for claims which he held as a primary indebtedness of said bank, on the ground that defendants were also liable for the

same by reason of their relations with that institution.

The declaration, filed and served in the case, was upon the common counts in assumpsit, also alleging that the indebtedness sought to be recovered arose to plaintiff and his assignors in amounts and manner as indicated in his bill of particulars attached to and made a part of the declaration, further stating that on the trial plaintiff would produce and give in evidence, under the money counts, certain certificates of deposit, copies of which were set out at length.

Defendants pleaded the general issue, with an affidavit attached denying execution of the instruments of indebtedness, of which notice was given. This affidavit is upon information and belief, which counsel for plaintiff contend is insufficient under Circuit Court Rule 8, and urge that the genuineness of the instruments therefore stands admitted under numerous authorities cited. In view of admissions found in the record and the general course of contention developed on the trial, we regard this question of but minor importance here. On the trial defendant's counsel, without directly admitting, did not seriously, or at least convincingly, contest the various claims and items of indebtedness offered and proven against the bank, but did strenuously object to and contend against them as tending to establish any liability on the part of defendants. The assignments of these claims to plaintiff were admitted on the trial. On that branch of the case, without going into details, we think it sufficient to state that in our opinion plaintiff's proofs were ample to establish against the bank, and without error so far as it was concerned, an indebtedness amounting to the sum for which judgment was recovered.

The really important issues of fact and law, to which most of the evidence and efforts of counsel were directed, are the relations which the various de-

fendants bore to the bank, and the interest they had in it, and whether or not, as a consequence, they became liable for its indebtedness.

The testimony, as it runs, associates, more or less closely, the "Farmers' & Merchants' Bank, Unincorporated, of Hanover," and the "Farmers' & Merchants' State Bank of Parma," which took their names from, and were respectively located in, two villages of Jackson county, Mich., situated about 14 miles distant from each other; the two concerns being commonly referred to in the record as the "Hanover Bank" and the "Parma Bank." Defendant Burletson was their chief promoter and organizer and guided their destinies until their doors were closed, which occurred on the same date, in September, 1908. He became an important witness for plaintiff and did not join the other four defendants in their appeal to this court. The judgment was against all five defendants.

Some three or four years before the complications which resulted in this litigation arose, Burletson, having associated with him one D. H. Powers, who resided in Pontiac, Mich., opened a bank in Parma called "the Bank of Parma," which was run as a private bank until April, 1907, when the "Farmers' & Merchants' State Bank of Parma" was organized and incorporated under the State banking laws to take over and continue the business of the Bank of Parma. It was capitalized at $20,000, and the five defendants, all residents of Parma, constituted its first board of directors; Burletson being chosen cashier, Bullen president, and Hunn vice president. In the meantime, early in February, 1907, Burletson had widened his field of financial activities by starting the Hanover bank. It was "considered as a proposition" in connection with the organization of the Parma State Bank, and later when the Parma bank was incorporated, in April, he interested and to some extent, the nature of which is in question, associated with him-

self in the Hanover enterprise defendants Bullen, Hunn, Corwin, and Helmer, his fellow directors in the Parma bank. He testifies:

"At about the time the organization of the State Bank of Parma was shaping itself, Mr. Hunn approached me and he said it would be necessary for me to include the bank at Hanover in the organization. This was against my will at the time for I had made different arrangements; that is, I had planned differently than that. But it was finally conceded and all of the directors—in accordance with that arrangement—all of the directors went over to Hanover and looked the situation over and there decided on a lot and the price to be paid for a lot. * * * There was a building constructed subsequently on the land which the directors of the Parma bank got at Hanover, which cost approximately $1,500. We bought furniture, a screw door safe, and a vault door and equipped the office for the banking business. The name we assumed for the bank at Hanover was Farmers' & Merchants' Bank."

It is undisputed that a lot was purchased in Hanover about the time stated; that all of the defendants drove over from Parma together on the day the lot was selected; that a banking building was erected upon it, equipped as testified, and the Farmers' & Merchants' Bank of Hanover was then opened and there run until its end, during most of which time George Hunn, son of defendant Hunn, was in immediate charge of the bank as assistant cashier. On March 15, 1907, the following advertisement was published in the Hanover Local:

Farmers' and Merchants' State Bank of Parma
Will Complete Its Organization April 1, 1907, under General
Banking Laws of the State of Michigan.
Capital Stock Paid in $20,000.
Stockholders.
[Giving a list of names which included defendants.]
Board of Directors.
C. W. Bullen,  G. L. Hunn,  W. H. Burletson,  Albert Helmer,
F. K. Corwin,  D. H. Power.

Advisory Board.

S. H. Godfrey, Walter Hobbins, Albert Helmer.

All of which are back of the Farmers' & Merchants' Bank of Hanover, representing a responsibility of close on to $300,000. Every favor granted consistent with conservative banking. Depositors and friends will always receive courteous attention.

Officers.

C. W. Bullen, President; G. L. Hunn, Vice President;
W. H. Burletson, Cashier;
F. K. Corwin, Chairman Board of Directors.
Four Per Cent. on Savings Deposits.

The usual stationery of various kinds was prepared and forms printed with the name of the bank upon them; the letterheads reading as follows:

C. W. Bullen, Pres.              G. L. Hunn, Vice Pres.
W. H. Burletson, Cashier.        Geo. W. Hunn, Ass't Cashier.
Farmers' & Merchants' Bank,
Hanover, Mich.

The above advertisement ran in the local newspaper for several weeks and the letterheads were regularly used in the business of the bank.

It was contended in behalf of plaintiff that the evidence warranted a verdict in his favor on any one of three theories, as the jury might find the facts to be: Either that defendants were shown to have been partners in fact between themselves as well as to all others, within the full meaning of that term; or that they were partners in legal effect as to third parties by reason of having been associated together in running the bank under such circumstances as constituted a general holding out that they were its owners and officers, responsible for it and back of it; or that they were estopped from denying a partnership owing to representations which they individually made or authorized. To some extent the same principles are involved in the last two propositions, but in the last one they apply more properly to defendants, and the claims against them, considered in their personal relations with creditors.

Plaintiff conceded on the trial that his proofs of estoppel did not apply to all the claims upon which he sought to recover, furnishing in that connection a distinguishing statement to the court and jury. The verdict and judgment were for $17,582.95, the full amount of his claim. It is therefore evident, under the concessions of counsel and charge of the court upon that subject, that the jury must have found, and rendered their verdict on the theory, that defendants were, as to creditors of the bank, partners, which eliminates from the case the distinct question of estoppel.

The record contains many assignments of error too numerous and interlacing to review them all separately and in detail, but, generally stated, under them it is contended that questions of fact submitted to the jury were not properly submitted under the circumstances of the case nor sustained by the evidence, and that certain testimony was erroneously admitted for the jury to take into consideration in arriving at their verdict.

It is first earnestly urged that the court erred in overruling defendant's motion for a directed verdict in their favor on the ground that there was no evidence from which an agreement of partnership could be found nor upon which a general holding out by defendants to the public of a partnership could be predicated.

The undisputed facts already detailed would, in the absence of explanation or denial, naturally lead to the inference that defendants were associated together in the Hanover enterprise and responsible for its management. But it is claimed by the four appealing defendants that all those things which might tend to implicate them were done and the bank was owned and run by defendant Burletson, without their participation or consent and for the most part without their knowledge; and that there is no competent

evidence tending to show either a partnership in fact or that the things done and representations made by Burletson tending to show a holding out as partners were authorized or acquiesced in by them.

We think there is testimony in this case tending to show that these defendants, already interested together in the organization and management of the Parma bank, and yet more closely associated together as its directors, sought to further extend their banking interests by together purchasing and taking over the Hanover bank, designing to run the same in connection with or under the auspices of the Parma bank and to share the profits of the Hanover bank between themselves. Losses do not seem to have been discussed and apparently were not anticipated. It is Burletson's testimony, which is in harmony with other confirmatory circumstances in the case, that a project was mooted and favorably considered by defendants when organizing the Parma bank to develop a financial center under their control and for their profit by establishing a chain of small banks in surrounding territory auxiliary to the Parma bank. Burletson had already started the private bank at Hanover and at least one other bank of like nature at Pittsford. The purchase of the Hanover bank was in line with such a project. No capital appears to have been invested in the Hanover bank. Its assets consisted of its deposits, out of which its building was erected and furnished. For a time the method of running the two banks resulted in an intermingling of bookkeeping, exchange, debits, credits, and accounts generally which, upon coming to the knowledge of the State banking department, was forbidden by it.

Burletson testifies in regard to the plans and agreement of defendants:

"This bank at Hanover was to be operated as sort of a branch bank, a branch of the Parma bank. I knew we could not operate the bank as a branch, but

I do know we could use it as a sort of an annex. That matter was discussed among the directors and myself. They talked in directors' meetings at Parma and discussed it in general—the matter of the construction of the building at Hanover. * * * The bank at Hanover was to be generally directed by the bank at Parma, or its directors. The earnings, if any, were to go toward the expenses of the bank at Parma, * * * and it was thought by the board of directors collectively that the expenses of the Hanover bank would entirely—the earnings of the Hanover bank would entirely liquidate the expenses of the State Bank at Parma, leaving the entire earnings of the bank at Parma wholly and clearly for the stockholders and directors. I asked the board of directors if it was their wish to include all the stockholders in this arrangement, all the stockholders of the Parma bank, and it was decided not to do so, but to have the earnings of the bank apply only to the proportionate holdings of the stock by the directors in the Parma bank; * * * I mean the directors of the Parma bank were to share in the profits of the Hanover bank in proportion to their stock in the Parma bank."

This record shows that the five defendants practically owned the Parma bank, the holdings of other stockholders being comparatively small, and the incidental benefit coming to them from the application of profits to the Hanover bank towards paying the expenses of the Parma bank would be slight and fairly offset by the time devoted by Burletson to the affairs of the Hanover bank while he was under pay of the Parma bank as its cashier. Burletson further testifies:

"This matter of the division of the profits, if any, of the Hanover bank, was discussed at directors' meetings of the Parma bank directors. All of us were present. It occurred at more than one directors' meeting. It was talked several times, discussed, and generally understood. All of the directors understood it. Furthermore, at the time this Hanover bank was coming into play, it was thought a pretty good plan to have several little banks around the

country, and I went so far as to get a list of the stock-
holders of the Concord bank, thinking perhaps we
might be able to get hold of that. Mr. Corwin (one
of the defendants) furnished me a list of the indi-
viduals who held stock in the Concord bank. *   *
*  They all had knowledge of just how we were con-
structing the building and carrying on our business
over there at Hanover and understood it. *   *   *
From that time on, until the Hanover bank was
closed, the bank at Parma ran it. I mean by the bank
at Parma the officers and directors of the bank at
Parma, of the Farmers' & Merchants' State Bank,
*   *   * defendants named in this case. *   *   *
In fact, there was no question ever raised in refer-
ence to the ownership of that bank up to the day the
bank at Parma closed. *   *   * "

Speaking of the advertisement published in the
Hanover paper, he says:

"I put the advertisement there. I could not tell
you who made the arrangement with the printer or
editor. It might have been myself. *   *   * I don't
remember whether any one was with me when I made
the arrangements for that ad. This much I do know:
A copy of that paper was taken to Parma and laid on
the counter at Parma where all the people who came
in there could look at it. They all saw it. The direc-
tors of the Parma bank saw it; every one of them saw
it."

While the witness did not remember that any one
was with him when he made arrangements for the
advertisement, Clyde E. Hall, the editor and printer
of the paper, testifies positively that defendant Hunn
was present and assisted in making the arrange-
ments. Being shown a copy of the advertisement, he
identified the same and testified in part as follows:

"Mr. Burletson and Mr. Hunn came to my office
together and gave me the copy and both read the copy
over with me. I also remember asking Mr. Hunn
about the spelling of his name as it appeared on the
copy. They both further stated that they were both
there in the interest of the bank for Hanover. I also

left my office and assisted them in interesting the business men of the village in the project."

Whether it was the intention to incorporate the bank of Hanover is not shown. Burletson testified that at a meeting of the dirctors of the Parma bank they elected as officers of the Hanover bank the same persons whose names appear in the advertisement, who held the same positions in the Parma bank, and says:

"It was not necessary for the persons who were interested in the Hanover bank to choose their officers as such. The officers who were officers in Parma were officers in Hanover. That was all there was to it. * * * The other directors knew this stationery was being ordered for the use of the Hanover bank. They knew about everything—the whole business. The whole matter was discussed in our directors' meetings."

On re-direct examination by plaintiff's counsel he was asked and answered as follows:

"*Q.* Did the directors of the Parma bank, these defendants here, understand they were taking money which was deposited in their bank in the name of the Hanover bank to build the bank building at Hanover?

"*A.* Yes, sir. * * * I know they understood that because Mr. Corwin asked me that question and I told him where it was coming from. The rest of them all knew it from general discussion of matters in board of directors' meetings, individual conversation that took place, and so on. Mr. Hunn and I spent a half day going to Horton looking towards interesting the Horton people in a bank."

The record also discloses much testimony by numerous witnesses, mostly customers of the bank and residents in and around Hanover, of an active interest shown by some of the defendants in the bank to the extent of soliciting patronage for it, giving assurances of its reliability, stating or admitting that they and the other defendants were running it and

back of it, and of the introduction to the witnesses of others as connected with and officers of the bank, without denial on their part. Several witnesses testify with greater or less certainty to being introduced to defendants by Burletson as the parties who were about to start a bank at Hanover, when they were there together, apparently on the day when a lot was secured as a site for the bank building. Some witnesses identified all the defendants, others only certain ones.

Albert Sanderson, a merchant of Hanover, said:

"I remember the occasion of the Hanover bank being started. * * * I think it was on the 15th of April. It occurred in my store. Mr. Culbert was standing near me. Mr. Burletson came in with Mr. Hunn and four other gentlemen, Mr. Hunn and Mr. Bullen, Mr. Helmer and Corwin. I am positive there were four besides Mr. Burletson. When they first opened the bank at Hanover I was doing business at that time with the Union Bank in Jackson. They tried to get me to do business, and I explained to them why I didn't. They said they could give me a statement that satisfied me they would be all right. After they got started, not at that time, but a month or so after that, I commenced to do business with the bank after I was satisfied what they told me was correct."

William Folks testified in part:

"I am a farmer. I am a brother of the plaintiff in this suit. I am pretty well acquainted with three of the defendants in this case, Mr. Hunn, Mr. Bullen, and Mr. Burletson. About the middle of April I met Mr. Burletson there in Hanover with four other gentlemen up there from Parma, Mr. Hunn, Mr. Bullen, and as I remember the other two, it was Mr. Corwin and Mr. Helmer. At that time we had a conversation relative to the bank on the ground the bank now stands on. Mr. Burletson introduced me to these other four members as directors and officers of the Hanover and Parma banks. Mr. Hunn says: 'We are going to put up a building here and get more

money so you can have all the money you want to buy stock with.' "

William Burdett said:

"Mr. Burletson came over to the elevator where I buy grain and brought four men and introduced them to me as directors of the Parma bank, and he said they were the men who would be back of the Hanover bank; they were looking for our business. In our business we pay out from $40,000 to $50,000 a year for grain. Two of the men that Mr. Burletson brought there were Mr. Bullen and Mr. Hunn. I can remember Mr. Hunn and Mr. Bullen, but the other two men, I don't think I ever met them before or since. I would not know them if I saw them again. I would know Mr. Hunn right there, but I would not know the other men. * * * They got our business within three days of the time they were there."

In passing upon the question of directing a verdict for defendants, the testimony on the part of plaintiff is to be taken at its strongest. So regarded, we think there was evidence to go to the jury, both on the issues of a partnership in fact *inter se* and a partnership as to third parties by a holding out.

A holding out, as the term is used when applied to partnership, while fundamentally predicated on the general principle of estoppel by conduct, comprehends indirect misrepresentation also and signifies that the purported partners have by language and conduct represented themselves or knowingly have authorized or suffered others to represent them at large as partners in such manner and to such an extent as to lead the public generally to believe that they are partners in fact.

When such a holding out is once established, not by proof of mere reputation but by proof of pertinent and convincing facts and circumstances, the parties so implicated become liable to one thus induced to give credit, not on the ground of any direct representations or dealings between the parties, but upon

the principle of a general policy to prevent fraud and imposition to which creditors in the business world would otherwise be liable. On this subject it has been said:

"The most difficult cases of this class occur where the defendant has not held *himself* out, but where he has been held out by others, and he alleges that they had no authority to do so. Express authority is not necessary; authority may be inferred from his conduct; and if a person has by signing prospectuses or allowing his name to be put to them, or by being party to resolutions, or by his own statements, though not intended to be repeated, or has in any other way so conducted himself as in fact to have authorized the holding out which he repudiates, he will not escape liability." Lindley on Partnership (1905), p. 72.

Error is assigned on admission of the advertisement in the Hanover Local, heretofore set out. Counsel say that this notice "had no tendency to show the relation of partnership by estoppel, nor could it be used as an admission of the existence of a partnership in fact," citing *Bennett* v. *Dean*, 35 Mich. 306; s. c., 41 Mich. 472 (2 N. W. 680). In that case plaintiff sued defendants as copartners under the name of the "National Savings Bank of Jackson, Mich.;" one of the defendants having advertised the other two defendants as directors in a bank of that name and started business, receiving some deposits, though there was in fact no such bank. The court held that the two defendants were not estopped from denying that they were partners. The court said that the printed notices relied on did not import the existence of a partnership or any connection by the two defendants involving the liabilities of such relation, but did suggest the existence of an incorporated bank and tended to negative a personal liability. In this case, while notice is given of an intention to incorporate a bank of $20,000 capital at Parma, it goes much further and states in effect that the proposed

officers named are also interested in and together backing the private bank at Hanover, in which village the notice was published, and personally liable, "representing a responsibility of close on to $300,000." We think the cases distinguishable and the notice admitted in this case competent evidence.

Testimony was admitted under objection of statements made by George Hunn and Melvin Carey relative to who was running the Hanover bank, each of whom at different times was in immediate charge of the bank and conducting its business with the public. While so employed they told parties making inquiry, and also certain persons whose business they solicited, that the bank was sound financially, being backed and run by the directors of the Parma bank, at times naming part or all. of the defendants. Exception is taken to this line of testimony as immaterial and hearsay; the statements not being a part of the res gestæ because they did not accompany an act performed under an agency and were in violation of the rule that the declaration of an agent is not admissible for the purpose of proving his authority. Counsel correctly state that the only possible relevancy of this testimony must be to show a connection of defendants or some of them with the Hanover bank, but we do not think it follows that "they are clearly within the prohibition of the rule that an agent's authority cannot be proven by his own declaration." There is testimony in the case that these men were hired with the knowledge and by express authority of defendants and put in charge of the bank to represent it in dealing with the public. The scope of their employment would naturally comprehend furnishing such information as is usually desired by actual or prospective customers. The information they gave came to them in the course of their employment and was the same as had already been promulgated by an advertisement in the public press. Whether or not

these representations were authorized by defendants is a question of fact in the case. In soliciting customers for the bank, a discussion of the financial responsibility of the institution and its backers could well be considered part of the res gestæ of such transaction. The testimony objected to contains no assertion on the part of Hunn and Carey that they were agents of defendants and had authority from them to make such representations. If their authority was not otherwise shown, the testimony would be inadmissible.

The court in instructing the jury upon that subject said:

"Testimony by depositors has been admitted as to statements made by them (that is, Carey and Hunn) to induce them to deposit there and while doing business at the bank. * * * This testimony as to such statements by Carey or George Hunn should not be considered by you unless you find from the other evidence, aside from their statements, that as regards George Hunn and Carey they were employed by the defendants, or those who may be found to have constituted the partnership or have been jointly interested, if any there were, and were at Hanover by virtue of that employment, doing the business of the defendants. * * * George Hunn could not, neither could Carey, make statements affecting those of the defendants who did not employ them or to whom George Hunn and Carey were not agents or representatives in the business of the bank. * * * "

Error is assigned and urged on refusal of the court to grant defendants' motion "to strike out all testimony of interviews with Burletson not in the presence of one or more of the other defendants." This motion was made at the conclusion of plaintiff's testimony and was then overruled. The objection is based on the case of *Scholtz* v. *Freud*, 128 Mich. 72 (87 N. W. 130), wherein the rule is laid down, as quoted from the syllabus:

"Where two persons were sued as partners, and one of them defaulted, his statements, tending to show the existence of a partnership, should have been excluded."

In that case the court said:

"McKinney was a defendant, who had permitted his default to be entered. He thereby admitted his liability, and the amount of damages only was to be determined. See 1 Green, Prac. 460. There was therefore no occasion to show the statements of McKinney, and they should have been excluded. As the court told the jury, such statements were not binding upon Freud."

Technically and as a matter of pleading the situation is not the same here. Burletson did not permit his default to be entered. He entered his appearance and pleaded the general issue. He testified at the trial. If default is the antithesis of appearance, he was not in a legal sense in default. It is true that at the trial he gave testimony tending to support plaintiff's contention, and judgment was entered against him with the rest. But irrespective of this question, conceding that the testimony was inadmissible, the court did ultimately, in effect, grant defendants' motion and said to the jury in charging them:

"The defendant Burletson is practically in default in this case. By such default, as the record now stands, he practically admits his liability. Therefore, any statements made by him, not in the presence and hearing of any of the other defendants, not under oath, should not be received nor considered by you to show a joint contract or partnership as against the other defendants or any of them. And this you should observe if in any portion of the preceding charge I have used language that might not be understood as equivalent to this direction. But, as to Burletson's testimony in this case as a witness, that is for your consideration and to give it such credibility as you think it entitled to."

Numerous assignments of error relate to different

portions of the charge. Some involve questions already considered, and others rule relating to partnership which it is urged were not properly presented. The charge is lengthy. Isolated portions may perhaps be pointed out which are inaccurate and insufficient, standing alone, but the jury heard it as a whole and it should be so considered. The court at length informed the jury of the nature of the case, the claims of litigants, the issues involved, and the rules of law by which they should be governed in passing upon the facts, devoting considerable time to the discussion of estoppel, submitting to them the questions of estoppel, partnership *inter se,* and partnership by holding out.

It is complained that the court did not differentiate clearly between estoppel and holding out as applied to particular claims. The court fully and correctly explained the rules of estoppel and further said:

"A person who holds himself out as a partner of a firm is estopped to deny such representations, not only as to those as to whom the representation was directly made, but as to all others who had knowledge of such holding out and in reliance thereon made deposits in the Hanover bank, provided they exercised due diligence in ascertaining the facts. One would not be exercising due diligence by relying on mere rumor or hearsay but should apply to one of the parties or some one invested with authority to make representations as to the matter, unless there was an actual holding out to the public generally. * * * These defendants engaged in contesting this case deny all holding out to the public and all knowledge of any holding out by any one and deny all knowledge of any publication or advertisements or statements or representations by any one that they had become and were connected with the Hanover bank, or its interests or its operations, or were in any manner whatsoever interested therein to any extent whatsoever. This claim in denial of such holding out to the public should be sustained by you unless the greater weight of the evidence establishes the contrary, and the

burden of proving that they so held out, as I have before instructed you, rests upon the plaintiff. If there was a holding out by any one or more of these defendants of a partnership or joint venture generally to the public, liability would attach as to the claims of all who are shown by the proofs to have known of such holding out and believed it and in reliance upon it deposited money at Hanover and have been damaged in consequence."

We think if any error is to be found in this it is in defendants' favor.

In such case it is immaterial whether or not the creditor relied upon mere rumor or hearsay. He would not for that reason be precluded from recovering if on the trial he was able to show a holding out by proof of actual facts and circumstances which established it. This instruction points out the distinction between estoppel, in which the representation is directly made to the creditor, and a holding out which may be made to the public generally, and of which "all others" having knowledge and relying thereon may avail themselves. Considered in its entirety, we find no reversible error in the charge.

Defendants moved the trial court to set aside the verdict and grant a new trial, urging as reasons many of the questions raised during the progress of the trial, and for the further reason that the verdict was not only not supported by any competent evidence but was against the overwhelming weight of evidence on each of the propositions involved. This motion was denied and error is assigned thereon.

It is urged that the only proof of any agreement, even to share profits of the Hanover bank, is in the testimony of Burletson, who is shown to have previously claimed that he was the sole owner of the bank, and that his testimony is squarely met by the positive denial of the four appealing defendants that the agreement as testified to by Burletson would not constitute a sufficient partnership agreement to sus-

tain the verdict, as it does not show a community of interests, or agreement to share losses, or any intent of the parties to make each other their agents, or to form a partnership. To sustain this proposition the leading case of *Beecher* v. *Bush*, 45 Mich. 188 (7 N. W. 785, 40 Am. Rep. 465), and others sustaining the same principles are cited and relied upon. In the *Beecher Case*, in deciding that no partnership was established, the court stated the general rule that to constitute a partnership there must be a community of interest in a business undertaking, in which the parties are principals and agents each for the other, entitling each to participate in the profits and entailing on each his share of any losses. In that case it appeared, undisputed, that the party sought to be charged had never held himself out, nor suffered himself to be held out, as a partner either to the public or to the plaintiff. The court held there could be no partnership even as to a third person when, as between the parties themselves there was no partnership in fact and the third person has not been misled by concealment of facts or by deceptive appearances, saying:

"If parties intend no partnership the courts should give effect to their intent, unless somebody has been deceived by their acting or assuming to act as partners; and any such case must stand upon its peculiar facts, and upon special equities"

—and it can well be added that in such cases strict definitions of partnership are not controlling and of doubtful service. In this case there is not only evidence that defendants held themselves out to the public as together running and backing the Hanover bank, or suffered others to so represent, but that they in fact associated themselves together in that business enterprise, agreeing to share the profits. While there is no evidence of an agreement to share the losses, such is always implied from an unqualified

mutual agreement to share profits in a joint commercial venture.

"All that is generally required to constitute a partnership as between the parties, is, that there should be an agreement to share in the profit and loss; and even less than this may make them responsible as partners as between themselves and third parties." *Tyler* v. *Scott,* 45 Vt. 261.

It has been laid down as a general proposition of law that, whenever—

"It is shown that business associates are sharing the profits of a business, of which they are the joint owners, and which they are carrying on pursuant to a contract between them, they are partners, however adroitly they may have attempted to escape from the partnership relation." 30 Cyc. p. 371.

In connection with the undisputed facts, the agreement testified to by Burletson is clearly characterized by the essentials of a partnership. If Burletson's testimony was unsupported by any extraneous evidence, and the issue stood only between his word and that of the other defendants, the contention that the verdict is against the weight of evidence would require serious consideration, but his story in many particulars is more consistent with the trend of transactions and conduct of the parties than theirs and is substantiated by much other circumstantial but persuasive proof.

The two banks were located in small villages not far apart and were closely associated in many ways. They were under the management of the same men, or man, having the same cashier. They failed at the same time. One was a private bank and the other incorporated, operating under the State banking laws; gross irregularities were found in connection with both. Defendants were all directors in the Parma bank and officially responsible for its management and implicated in the irregularities. The con-

nection of defendants with the Hanover bank as its owners and backers had been repeatedly and openly declared over its counter by those in charge to customers and prospective customers and had been advertised in the public press. Numerous persons had told of various things said and done by defendants to the same effect. Whether true or false it had become a matter, at Hanover, of common understanding and belief. The avowals of defendants that this was not only without their authority but entirely unknown to them might well test the credulity of the jury. In addition to this, there is in the case testimony, too lengthy for detail here, of various witnesses as to acts and words of defendants, and each of them, admitting or indicating that they were, with the other directors of the Parma bank, back of and running the Hanover bank. Even after the bank was closed Hunn is shown to have telephoned to Sanderson at Hanover requesting him not to let Burletson go into the bank, and, when asked what authority he would have to keep him out, said, "I give you authority to keep him out; take a club and knock him down if you can't do any other way;" and at about the same time Bullen and Hunn, when seeking to employ the law firm of Wilson & Cobb, of Jackson, in connection with these matters, and being advised the attorneys could not serve them if their interests were antagonistic to creditors of the Hanover bank who had already retained the firm, declared that there would be no questions raised, as they admitted their liability and could not get rid of paying those creditors if they wanted to.

An examination of the testimony of the four defendants in the printed record impresses us that it is tinctured with evasions, contradictions, and an irregularity of recollection which a jury might find difficult to reconcile with frankness or with undisputed facts in the case. All this was for the jury, and the

witnesses were before the jury whose function it was to determine their credibility. From the record as it reads we are not prepared to hold that the verdict was so against the overwhelming weight of evidence as to call for a reversal.

The judgment is affirmed.

MOORE, MCALVAY, BROOKE, KUHN, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.